Approved: _____
DANIEL S. GOLDMAN/AMY LESTER
Assistant United States Attorneys

Before: HONORABLE FRANK MAAS
Chief United States Magistrate Judge
Southern District of New York

15 MAG 1196

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         : SEALED COMPLAINT
                                 :
          - v. -                 : Violations of 15 U.S.C.
                                 : §§ 78j(b) and 78ff;
MARCELLO TREBITSCH,              : 17 C.F.R. § 240.10b-5; and
    a/k/a "Yair Trebitsch,"      : 18 U.S.C. §§ 1343 and 2
                                 :
          Defendant.             : COUNTY OF OFFENSE:
                                 : NEW YORK

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

CONSTANTINE S. VOULGARIS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

## COUNT ONE
### (Securities Fraud)

1. From at least in or about 2009 through in or about December 2014, MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, as set forth above, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon investors, to wit, TREBITSCH solicited more than $7 million from investors based on false and misleading representations

that he would use the money to purchase securities on their behalf when, in fact, TREBITSCH used only a portion of the investors' money to purchase securities and used the remainder for his own personal benefit and the benefit of others, including to repay other investors.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.   From at least in or about 2009 through in or about December 2014, in the Southern District of New York and elsewhere, MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TREBITSCH solicited more than $7 million from investors through the use of telephones, electronic communications, and wire transfers, including wire transfers of funds from investors that cleared through the Federal Reserve Bank located in New York, New York, based on false and misleading representations that he would use the money to purchase securities on their behalf when, in fact, TREBITSCH used only a portion of the investors' money to purchase securities and used the remainder for his own personal benefit and the benefit of others, including to repay other investors.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.   I have been a Special Agent with the FBI for more than four years. I am currently assigned to a squad within the FBI that is responsible for investigating violations of the federal securities laws, as well as wire, bank, and mail fraud laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for

2

committing in such offenses.

4. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including documents and information provided by investors, a review of bank account and brokerage account records and public records, information provided by other participants in the investigation, and information provided by witnesses who participated in conversations and written communications with MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## The Scheme to Defraud

5. Based upon interviews of witnesses, a review of documents provided by witnesses, a review of bank account and brokerage account records, and a review of electronic communications between MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, and others, I have learned that:

   a. Between at least in or about 2009 and in or about July 2014, TREBITSCH solicited over $7 million in funds from multiple investors based on the representation that TREBITSCH would invest the funds on the investors' behalf.

   b. In order to induce the investors to invest their money with him, TREBITSCH made the following false and misleading representations, among others:

      i. TREBITSCH would invest the investors' money in an investment fund called Allese Capital LLC ("Allese"), which TREBITSCH co-owned with his wife.

      ii. TREBITSCH would invest the investors' money in large-cap stocks traded on major stock exchanges, and would purchase and sell those stocks on a daily basis, with little or no funds remaining invested in the market at the end of each trading day.

      iii. TREBITSCH's trading strategy would result in double-digit annual returns in the range of 14 to 16 percent,

with a minimal risk of loss.

    iv. TREBITSCH cleared his trades through a major Wall Street investment bank, which had also agreed to invest $50 million in Allese.

    v. TREBITSCH's wife, who was a Certified Public Accountant ("CPA"), was a co-owner and managing partner in Allese, and also kept the books for Allese.

    c. In truth and in fact, TREBITSCH invested only a portion of the funds given to him by the investors in securities, and instead principally used the investors' money for his own personal benefit and the benefit of others, including to repay other investors.

    d. With respect to that portion of funds which he did invest in securities, TREBITSCH suffered net trading losses, which he did not disclose to the investors. Rather, in order to perpetuate the scheme to defraud, TREBITSCH created false documents, including phony account statements (the "Allese Account Statements") and fabricated Schedule K-1 (Form 1065) federal tax forms (the "K-1s"), that purported to show positive annual returns in the range of 15 to 19 percent on the investors' investments.

    e. TREBITSCH communicated with investors primarily by telephone and email. In these communications, TREBITSCH made representations to investors concerning the purported status of their investments, including the purported returns on those investments, and solicited additional funds from investors.

    f. TREBITSCH instructed investors to send funds for investment to bank accounts which he and his wife controlled via wire transfers, at least some of which cleared through the Federal Reserve Bank located in New York, New York,

### Victim-1 Invests with TREBITSCH

6. Based on an interview of an individual ("Victim-1") who invested with MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, and a review of documents provided by Victim-1, I have learned the following:

    a. Victim-1 is a real estate developer with an office in Rockville, Maryland.

b. In or about 2009, Victim-1 met TREBITSCH through Victim-1's attorney ("Attorney-1"), who had another client who had invested with TREBITSCH in the past. After an initial conversation by telephone, TREBITSCH and Victim-1 met in person at TREBITSCH's office in Brooklyn, New York, where TREBITSCH made the following representations, among others, to Victim-1:

    i. TREBITSCH traded in large-cap stocks and earned annual returns in the range of 14 to 16 percent.

    ii. TREBITSCH closed out his trading positions on a daily basis in order to minimize the risk of loss.

    iii. Victim-1 could redeem his investment at any time, provided that he gave TREBITSCH notice of the redemption request at least one quarterly period in advance.[1]

c. Also in or about 2009, after making an initial investment of $300,000 with TREBITSCH, Victim-1 requested a meeting with TREBITSCH's wife, which took place at a restaurant in Manhattan. At that meeting, TREBITSCH's wife represented to Victim-1 that she co-owned Allese with TREBITSCH, and that she was a CPA and maintained the books and records for Allese.

d. Between in or about October 2009 and in or about 2013, TREBITSCH solicited more than $6.5 million from Victim-1 for investment in Allese. During the same period of time, Victim-1 received approximately $2.2 million in redemptions from TREBITSCH. Victim-1 never received any other return on his investment.

### Victim-2 Invests with TREBITSCH

7. Based on an interview of another individual ("Victim-2") who invested with MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, and a review of documents provided by Victim-2, I have learned the following:

a. Victim-2 is a licensed CPA and a partner in an accounting firm located in Rockville, Maryland. Victim-2 has been Victim-1's personal and business accountant for more than twenty years.

b. Beginning in or about 2010, Victim-2 became aware

---

[1] Documents provided to Victim-1 by TREBITSCH provided for notice periods varying from at least two weeks to at least 45 days for redemptions.

that Victim-1 had invested with TREBITSCH in connection with Victim-2's preparation of personal and business tax filings for Victim-1 for the 2009 tax year.

   c. In particular, around that time, Victim-2 reviewed several K-1 forms for Victim-1's investments with TREBITSCH, which purported to show Victim-1's taxable earnings as a result of the investments in Allese.

   d. In or about April 2013, Victim-2 began receiving duplicate copies of Victim-1's Allese Accountant Statements in his role as Victim-2's accountant, and was therefore aware of the (falsely) stated rate of return for Victim-1's investments with TREBITSCH.

   e. In or about January 2014, Victim-2 decided to invest with TREBITSCH himself. On or about January 3, 2014, Victim-2 invested a total of $500,000 with Trebitsch: $250,000 in funds in the name of Victim-2's accounting firm, and $250,000 in funds in the name of Victim-2 and his wife.

   f. In or about February 2014, Victim-2 began to receive Allese Account Statements from TREBITSCH purporting to show the value of his investments.

   g. In or about April 2014, Victim-2 invested an additional $200,000 with TREBITSCH.

   h. On or about May 15, 2014, Victim-2 sent TREBITSCH an email requesting a monthly breakdown of Allese's performance from January 2014 through the present. In response, on or about May 19, 2014, TREBITSCH forwarded Victim-2 a document purporting to show Allese's performance in 2013 and early 2014 (the "Performance Report"). According to the Performance Report, Allese generated an annual return of 16.20% for 2013 and an average monthly return of 1.23% for 2014.

   i. Victim-2 never received any disbursements or redemptions from his investments with TREBITSCH.

### The Fraud is Revealed

  8. Based on the interviews of Victim-1, Victim-2, and Attorney-1, as well as my review of documents provided by Victim-1 and Victim-2, I have learned the following:

   a. In or about early June 2014, Victim-1 requested a redemption in the amount of $1.4 million from MARCELLO

TREBITSCH, a/k/a "Yair Trebitsch," the defendant. At the time that Victim-1 made this redemption request, the Allese Account Statements purported to show that the balance in Victim-1's investments accounts was approximately $7 million. TREBITSCH acknowledged Victim-1's redemption request by email on June 16, 2014 and promised to contact Victim-1.

   b. Despite numerous requests, TREBITSCH never fulfilled Victim-1's June 2014 redemption request.

   c. On or about July 17, 2014, TREBITSCH met with Attorney-1 in the lobby of a hotel located in lower Manhattan. At that meeting, TREBITSCH told Attorney-1 that he had actually lost Victim-1's money and asked for advice about what to do. Attorney-1 advised TREBITSCH to speak to a lawyer.

   d. A few days later, on or about July 21, 2014, Attorney-1, Victim-1, and Victim-2 attended a meeting with TREBITSCH and a lawyer who represented TREBITSCH ("Attorney-2") at Victim-1's office in Rockville, Maryland.

   e. At the meeting, Attorney-2 told Attorney-1, Victim-1, and Victim-2, in TREBITSCH's presence, in sum and substance, and among other things, that most of the money that Victim-1 and Victim-2 had invested had been lost by TREBITSCH as the result of trading losses. Attorney-2 also stated that approximately $400,000 of Victim-1 and Victim-2's money had been taken by TREBITSCH as his "fee."

   f. At the meeting, TREBITSCH acknowledged, among other things, that the Allese Account Statements he sent to Victim-1 and Victim-2 were false, in that they did not accurately reflect the value of Victim-1 and Victim-2's investments with TREBITSCH.

   g. TREBITSCH, through Attorney-2, agreed to provide certain information to Victim-1 -- including, among other things, bank records, trading records, and other documents -- to prove that, in fact, TREBITSCH no longer had any funds belonging to Victim-1.

   h. In or about August 2014, Victim-1 retained a forensic accountant ("the Accountant") to review the records provided by TREBITSCH.

  9. Based on an interview of the Accountant, as well as my review of documents prepared by the Accountant and bank account and brokerage account records associated with MARCELLO

7

TREBITSCH, a/k/a "Yair Trebitsch," the defendant, TREBITSCH's wife, and Allese, I have learned the following:

a. In the Fall of 2014, the Accountant met with TREBITSCH approximately seven or eight times at TREBITSCH's office in Brooklyn, New York, where TREBITSCH provided certain records to the Accountant, including, but not limited to, an excel spreadsheet that TREBITSCH stated was the template that he used to generate certain of the Allese Account Statements (the "Allese Excel Spreadsheet").

b. After reviewing the Allese Excel Spreadsheet, the Accountant determined that the formula used to compute the month-end returns on Victim-1's investment was designed to compute fictitious values based upon a certain percentage increase (or, in theory, decrease) selected by the person using the formula, not to reflect the actual increase or decrease in any real investments.

c. There were no real returns on Victim-1's investments, because the funds paid to TREBITSCH by Victim-1 were never invested by Allese in large-cap stocks.

d. The computer-generated Allese Account Statements, and the corresponding K-1s provided to Victim-1 -- both of which reflected consistent gains for Victim-1's investments -- were fraudulent and did not accurately reflect a true accounting of Victim-1's investments with Allese.

e. Contrary to his representations to Victim-1, prior to Victim-1's investment, TREBITSCH did not clear his trades through a major Wall Street investment bank, nor did Allese ever receive a $50 million investment from that bank. Indeed, the records reflect that Victim-1 was one of only a few investors in Allese and, for much of the time period between 2010 and 2014, Victim-1 was the only investor.

f. In the Fall of 2014, during a telephone conversation with the Accountant, TREBITSCH stated, in sum and substance, and among other things, "If I could write a check today to repay [Victim-1], I still would have done a terrible thing to a human being."

### Further Proof of the Fraudulent Scheme

10. Based on my review of the bank records for accounts associated with Allese, MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, and TREBITSCH's wife, I have learned

the following:

      a.    TREBITSCH did not invest Victim-1 and Victim-2's money in large-cap stocks through Allese as he had promised. In truth and in fact, TREBITSCH used only a portion of the funds to engage in trading, and that trading -- which was largely conducted through TREBITSCH's personal brokerage accounts, not Allese brokerage accounts -- resulted in net losses.

      b.    Rather, between in or about 2010 and at least in or about 2014, TREBITSCH transferred or caused to be transferred, at a minimum, hundreds of thousands of dollars of Victim-1 and Victim-2's money to personal bank accounts or brokerage accounts held by TREBITSCH and/or TREBITSCH's wife for their benefit or the benefit of others.

      c.    For example, a review of the bank records demonstrates the following with respect to funds invested in Allese by Victim-1:

          i.    On or about March 3, 2010, an Allese Account at JPMorgan Chase Bank ending in 8765, which is controlled by TREBITSCH and TREBITSCH's wife (the "8765 Account"), received a wire transfer in the amount of $500,000 from Victim-1. Prior to the wire transfer from Victim-1, the 8765 Account had a balance of approximately $19.

          ii.    On or about March 9, 2010, TREBITSCH wrote a check in the amount of $425,000 from the 8765 Account to a company called Israeli Car Rental (the "ICR Check").

          iii.    On or about the same date, the ICR Check was deposited into an account at JPMorgan Chase Bank ending in 2633 and held in the name "Israeli Car Rental Co" (the "2633 Account"). The sole signatory on the 2633 Account is TREBITSCH's wife.[2]

          iv.    Within two weeks of the ICR Check being deposited into the 2633 Account, TREBITSCH's wife caused approximately $422,000 to be transferred to other accounts that she and/or TREBITSCH controlled, to be used for the benefit of TREBITSCH, TREBITSCH's wife, and/or others.

      d.    A review of the bank records demonstrates that,

---

[2] The 2633 Account was opened on or about March 9, 2010. TREBITSCH's wife is listed as the "President" of Israeli Car Rental Co on the signature card for the account.

with respect to funds invested in Allese by Victim-2, TREBITSCH never invested any of Victim-2's money. Rather TREBITSCH used Victim-2's money to pay distributions to Victim-1, in Ponzi-scheme fashion, as follows:

        i.    On or about January 3, 2014, an Allese account at Bank of America ending in 8696, which is controlled by TREBITSCH (the "8696 Account"), received a wire transfer in the amount of $500,000 from Victim-2's accounting firm, comprising Victim-2's first two investments in Allese. Prior to the wire transfer from Victim-2, the 8696 Account had a balance of approximately $182.

        ii.    On or about January 16, 2014, TREBITSCH caused Victim-1 to receive distributions in the amounts of $98,894, $76,571, $20,786, and $55,504 on Victim-1's investments in Allese via wire transfers from the 8696 Account to accounts held by Victim-1.

        iii.    On or about April 21, 2014, an Allese account at TD Bank ending in 4549 (the "4549 Account"), received a wire transfer in the amount of $200,000 from Victim-2. Prior to the wire transfer from Victim-2, the 4549 Account had a zero balance.

        iv.    On or about April 23, 2014, TREBITSCH caused Victim-1 to receive distributions in the amounts of $125,810, $32,272, $23,377, and $21,481 on Victim-1's investments in Allese[3] via wire transfers from the 4549 Account to accounts held by Victim-1.

11.    On or about April 1, 2014, I participated in the execution of court-authorized search warrants at the business location of Allese and the home (the "Residence") of MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant. During the search of the Residence, the FBI recovered the following from a suitcase located in a closet off the kitchen:

        a.    A handwritten document that appears to contain

---

[3] These distributions total $202,940, which is $2,940 more than the $200,000 wire transfer from Victim-2. On or about April 23, 2014, TREBITSCH transferred additional funds into the 4549 Account in order to cover the full amount of the distributions to Victim-1.

notes written by TREBITSCH (the "Note").[4] The Note states, in sum and substance, "This is the hardest letter I have to write. Nothing that I can say can justify what I have done. I reckognize [sic] the tremendous pain along with financial," followed by the word "pain," crossed out.

        b.    The Note was written on a single sheet of paper that was part of a larger pile of loose paper which also contained (1) a typed list of the purported value of the investments held by Victim-1 and Victim-2 as of June 30, 2014 according to the Allese Account Statements; (2) and a receipt from an Amtrak ticket from New York's Penn Station to Washington, D.C. on July 21, 2014, the date of the meeting with Victim-1 and Victim-2 described above in subparagraphs 8(d) through (g).

WHEREFORE, I respectfully request that an arrest warrant be issued for MARCELLO TREBITSCH, a/k/a "Yair Trebitsch," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                                                CONSTANTINE S. VOULGARIS
                                                SPECIAL AGENT
                                                FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
10th day of April, 2015

HONORABLE FRANK MAAS
CHIEF UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

[4] I have reviewed other documents containing TREBITSCH's handwriting and have compared those documents to the Note and the handwriting appears to be the same.

11